Justice Breyer,
with whom
Justice Ginsburg and Justice Sotomayor join, dissenting.
In my view, Justice Stevens has demonstrated that the Fourteenth Amendment’s guarantee of “substantive due process” does not include a general right to keep and bear firearms for purposes of private self-defense. As he argues, the Framers did not write the Second Amendment with this objective in view. See ante, at 896-899 (dissenting opinion). Unlike other forms of substantive liberty, the carrying of arms for that purpose often puts others’ lives at risk. See ante, at 891-893. And the use of arms for private self-defense does not warrant federal constitutional protection from state regulation. See ante, at 899-905.
The Court, however, does not expressly rest its opinion upon “substantive due process” concerns. Rather, it directs its attention to this Court’s “incorporation” precedents and asks whether the Second Amendment right to private self- *913 defense is “fundamental” so that it applies to the States through the Fourteenth Amendment. See ante, at 759-766.
I shall therefore separately consider the question of “incorporation.” I can find nothing in the Second Amendment’s text, history, or underlying rationale that could warrant characterizing it as “fundamental” insofar as it seeks to protect the keeping and bearing of arms for private self-defense purposes. Nor can I find any justification for interpreting the Constitution as transferring ultimate regulatory authority over the private uses of firearms from democratically elected legislatures to courts or from the States to the Federal Government. I therefore conclude that the Fourteenth Amendment does not “incorporate” the Second Amendment’s right “to keep and bear Arms.” And I consequently dissent.
I
The Second Amendment says: “A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.” Two years ago, in District of Columbia v. Heller, 554 U. S. 570 (2008), the Court rejected the pre-existing judicial consensus that the Second Amendment was primarily concerned with the need to maintain a “well regulated Militia.” See id., at 638, and n. 2 (Stevens, J., dissenting); id., at 672-679. United States v. Miller, 307 U. S. 174, 178 (1939). Although the Court acknowledged that “the threat that the new Federal Government would destroy the citizens’ militia by taking away their arms was the reason that right. .. was codified in a written Constitution,” the Court asserted that “individual self-defense . . . was the central component of the right itself.” Heller, 554 U. S., at 599 (some emphasis added). The Court went on to hold that the Second Amendment restricted Congress’ power to regulate handguns used for self-defense, and the Court found unconstitutional the District of Columbia’s ban on the possession of handguns in the home. Id., at 635.
*914 The Court based its conclusions almost exclusively upon its reading of history. But the relevant history in Heller was far from clear: Four dissenting Justices disagreed with the majority’s historical analysis. And subsequent scholarly writing reveals why disputed history provides treacherous ground on which to build decisions written by judges who are not expert at history.
Since Heller, historians, scholars, and judges have continued to express the view that the Court’s historical account was flawed. See, e. g., Konig, Why the Second Amendment Has a Preamble: Original Public Meaning and the Political Culture of Written Constitutions in Revolutionary America, 56 UCLA L. Rev. 1295 (2009); Finkelman, It Really Was About a Well Regulated Militia, 59 Syracuse L. Rev. 267 (2008) ; P. Charles, The Second Amendment: The Intent and Its Interpretation by the States and the Supreme Court (2009) ; Merkel, The District of Columbia v. Heller and Antonin Scalia’s Perverse Sense of Originalism, 13 Lewis & Clark L. Rev. 349 (2009); Kozuskanich, Originalism in a Digital Age: An Inquiry Into the Right To Bear Arms, 29 J. Early Republic 585 (2009); Cornell, St. George Tucker’s Lecture Notes, the Second Amendment, and Originalist Methodology: A Critical Comment, 103 Nw. U. L. Rev. 1541 (2009); Posner, In Defense of Looseness: The Supreme Court and Gun Control, New Republic, Aug. 27, 2008, pp. 32-35; see also Epstein, A Structural Interpretation of the Second Amendment: Why Heller Is (Probably) Wrong on Originalist Grounds, 59 Syracuse L. Rev. 171 (2008).
Consider as an example of these critiques an amici brief filed in this case by historians who specialize in the study of the English Civil Wars. They tell us that Heller misunderstood a key historical point. See Brief for English/Early American Historians as Amici Curiae (hereinafter English Historians’ Brief) (filed by 21 professors at leading universities in the United States, United Kingdom, and Australia). Heller’s conclusion that “individual self-defense” was “the *915 central component” of the Second Amendment’s right “to keep and bear Arms” rested upon its view that the Amendment “codified a pre-existing right” that had “nothing whatever to do with service in a militia.” 554 U. S., at 599, 592-593. That view in turn rested in significant part upon Blackstone having described the right as “ ‘the right of having and using arms for self-preservation and defence,’” which reflected the provision in the English Declaration of Right of 1689 that gave the King’s Protestant ‘“subjects’” the right to “ ‘have arms for their defence suitable to their Conditions, and as allowed by Law.’ ” Id., at 593-594 (quoting 1 W. Blackstone, Commentaries on the Laws of England 140 (1765) (hereinafter Blackstone), and 1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441 (1689)). The Framers, said the majority, understood that right “as permitting a citizen to ‘repe[l] force by force’ when ‘the intervention of society in his behalf, may be too late to prevent an injury.’ ” 554 U. S., at 595 (quoting 1 Blackstone’s Commentaries 145-146, n. 42 (S. Tucker ed. 1803)).
The historians now tell us, however, that the right to which Blackstone referred had, not nothing, but everything, to do with the militia. As properly understood at the time of the English Civil Wars, the historians claim, the right to bear arms “ensured that Parliament had the power” to arm the citizenry: “to defend the realm” in the case of a foreign enemy, and to “secure the right of ‘self-preservation,’” or “self-defense,” should “the sovereign usurp the English Constitution.” English Historians’ Brief 3, 8-13, 23-24 (emphasis added). Thus, the Declaration of Right says that private persons can possess guns only “ ‘as allowed by law.’ ” Id., at 13. See id., at 20-24. Moreover, when Blackstone referred to “ ‘the right of having and using arms for self-preservation and defence,’ ” he was referring to the right of the people “to take part in the militia to defend their political liberties,” and to the right of Parliament (which represented the people) to raise a militia even when the King sought to deny it *916 that power. Id., at 4, 24-27 (emphasis added). Nor can the historians find any convincing reason to believe that the Framers had something different in mind than what Blackstone himself meant. Compare Heller, supra, at 593-595, with English Historians’ Brief 28-40. The historians concede that at least one historian takes a different position, see id., at 7, but the Court, they imply, would lose a poll taken among professional historians of this period, say, by a vote of 8 to 1.
If history, and history alone, is what matters, why would the Court not now reconsider Heller in light of these more recently published historical views? See Leegin Creative Leather Products, Inc. v. PSKS, Inc., 551 U. S. 877, 923-924 (2007) (Breyer, J., dissenting) (noting that stare decisis interests are at their lowest with respect to recent and erroneous constitutional decisions that create unworkable legal regimes); Citizens United v. Federal Election Comm’n, 558 U. S. 310, 362-363 (2010) (listing similar factors); see also Wallace v. Jaffree, 472 U. S. 38, 99 (1985) (Rehnquist, J., dissenting) (“[S]tare decisis may bind courts as to matters of law, but it cannot bind them as to matters of history”). At the least, where Heller’s historical foundations are so uncertain, why extend its applicability?
My aim in referring to this history is to illustrate the reefs and shoals that lie in wait for those nonexpert judges who place virtually determinative weight upon historical considerations. In my own view, the Court should not look to history alone but to other factors as well — above all, in cases where the history is so unclear that the experts themselves strongly disagree. It should, for example, consider the basic values that underlie a constitutional provision and their contemporary significance. And it should examine as well the relevant consequences and practical justifications that might, or might not, warrant removing an important question from the democratic decisionmaking process. See ante, at 873- *917 877 (Stevens, J., dissenting) (discussing shortcomings of an exclusively historical approach).
II
A
In my view, taking Heller as a given, the Fourteenth Amendment does not incorporate the Second Amendment right to keep and bear arms for purposes of private self-defense. Under this Court’s precedents, to incorporate the private self-defense right the majority must show that the right is, e. g., “fundamental to the American scheme of justice,” Duncan v. Louisiana, 391 U. S. 145, 149 (1968); see ibid.., n. 14; see also ante, at 791 (plurality opinion) (finding that the right is “fundamental” and therefore incorporated). And this it fails to do.
The majority here, like that in Heller, relies almost exclusively upon history to make the necessary showing. Ante, at 768-780. But to do so for incorporation purposes is both wrong and dangerous. As Justice Stevens points out, our society has historically made mistakes — for example, when considering certain 18th- and 19th-century property rights to be fundamental. Ante, at 876. And in the incorporation context, as elsewhere, history often is unclear about the answers. See Part I, supra; Part III, infra.
Accordingly, this Court, in considering an incorporation question, has never stated that the historical status of a right is the only relevant consideration. Rather, the Court has either explicitly or implicitly made clear in its opinions that the right in question has remained fundamental over time. See, e. g., Apodaca v. Oregon, 406 U. S. 404, 410 (1972) (plurality opinion) (stating that the incorporation “inquiry must focus upon the function served” by the right in question in “contemporary society” (emphasis added)); Duncan, supra, at 154 (noting that the right in question “continues to receive strong support”); Klopfer v. North Carolina, 386 *918 U. S. 213,226 (1967) (same). And, indeed, neither of the parties before us in this case has asked us to employ the majority’s history-constrained approach. See Brief for Petitioners 67-69 (arguing for incorporation based on trends in contemporary support for the right); Brief for Respondent City of Chicago et al. 23-31 (hereinafter Brief for Municipal Respondents) (looking to current state practices with respect to the right).
I thus think it proper, above all where history provides no clear answer, to look to other factors in considering whether a right is sufficiently “fundamental” to remove it from the political process in every State. I would include among those factors the nature of the right; any contemporary disagreement about whether the right is fundamental; the extent to which incorporation will further other, perhaps more basic, constitutional aims; and the extent to which incorporation will advance or hinder the Constitution’s structural aims, including its division of powers among different governmental institutions (and the people as well). Is incorporation needed, for example, to further the Constitution’s effort to ensure that the government treats each individual with equal respect? Will it help maintain the democratic form of government that the Constitution foresees? In a word, will incorporation prove consistent, or inconsistent, with the Constitution’s efforts to create governmental institutions well suited to the carrying out of its constitutional promises?
Finally, I would take account of the Framers’ basic reason for believing the Court ought to have the power of judicial review. Alexander Hamilton feared granting that power to Congress alone, for he feared that Congress, acting as judges, would not overturn as unconstitutional a popular statute that it had recently enacted, as legislators. The Federalist No. 78, p. 405 (G. Carey & J. McClellan eds. 2001) (“This independence of the judges is equally requisite to guard the constitution and the rights of individuals from the *919 effects of those ill humours which” can, at times, lead to “serious oppressions of the minor party in the community”). Judges, he thought, may find it easier to resist popular pressure to suppress the basic rights of an unpopular minority. See United States v. Carotene Products Co., 304 U. S. 144, 152, n. 4 (1938). That being so, it makes sense to ask whether that particular comparative judicial advantage is relevant to the case at hand. See, e. g., J. Ely, Democracy and Distrust (1980).
B
How do these considerations apply here? For one thing, I would apply them only to the private self-defense right directly at issue. After all, the Amendment’s militia-related purpose is primarily to protect States from federal regulation, not to protect individuals from militia-related regulation. Heller, 554 U. S., at 599; see also Miller, 307 U. S., at 178. Moreover, the Civil War Amendments, the electoral process, the courts, and numerous other institutions today help to safeguard the States and the people from any serious threat of federal tyranny How are state militias additionally necessary? It is difficult to see how a right that, as the majority concedes, has “largely faded as a popular concern” could possibly be so fundamental that it would warrant incorporation through the Fourteenth Amendment. Ante, at 770. Hence, the incorporation of the Second Amendment cannot be based on the militia-related aspect of what Heller found to be more extensive Second Amendment rights.
For another thing, as Heller concedes, the private self-defense right that the Court would incorporate has nothing to do with “the reason” the Framers “codified” the right to keep and bear arms “in a written Constitution.” 554 U. S., at 599 (emphasis added). Heller immediately adds that the self-defense right was nonetheless “the central component of the right.” Ibid. In my view, this is the historical equivalent of a claim that water runs uphill. See Part I, supra. But, taking it as valid, the Framers’ basic reasons for includ *920 ing language in the Constitution would nonetheless seem more pertinent (in deciding about the contemporary importance of a right) than the particular scope 17th- or 18th-century listeners would have then assigned to the words they used. And examination of the Framers’ motivation tells us they did not think the private armed self-defense right was of paramount importance. See Amar, The Bill of Rights as a Constitution, 100 Yale L. J. 1131, 1164 (1991) (“[T]o see the [Second] Amendment as primarily concerned with an individual right to hunt, or protect one’s home,” would be “like viewing the heart of the speech and assembly clauses as the right of persons to meet to play bridge”); see also, e. g., Rakove, The Second Amendment: The Highest Stage of Originalism, 76 Chi.-Kent L. Rev. 103, 127-128 (2000); Brief for Historians on Early American Legal, Constitutional, and Pennsylvania History as Amici Curiae 22-33.
Further, there is no popular consensus that the private self-defense right described in Heller is fundamental. The plurality suggests that two amici briefs filed in the case show such a consensus, see ante, at 789, but, of course, numerous amici briefs have been filed opposing incorporation as well. Moreover, every State regulates firearms extensively, and public opinion is sharply divided on the appropriate level of regulation. Much of this disagreement rests upon empirical considerations. One side believes the right essential to protect the lives of those attacked in the home; the other side believes it essential to regulate the right in order to protect the lives of others attacked with guns. It seems unlikely that definitive evidence will develop one way or the other. And the appropriate level of firearm regulation has thus long been, and continues to be, a hotly contested matter of political debate. See, e. g., Siegel, Dead or Alive: Originalism as Popular Constitutionalism in Heller, 122 Harv. L. Rev. 191, 201-245 (2008). (Numerous sources supporting arguments and data in Part II-B can be found in the Appendix, infra.)
*921 Moreover, there is no reason here to believe that incorporation of the private self-defense right will further any other or broader constitutional objective. We are aware of no argument that gun-control regulations target or are passed with the purpose of targeting “discrete and insular minorities.” Carolene Products Co., supra, at 153, n. 4; see, e. g., ante, at 904-905 (Stevens, J., dissenting). Nor will incorporation help to ensure equal respect for individuals. Unlike the First Amendment’s rights of free speech, free press, assembly, and petition, the private self-defense right does not constitute a necessary part of the democratic process that the Constitution seeks to establish. See, e. g., Whitney v. California, 274 U. S. 357, 377 (1927) (Brandeis, J., concurring). Unlike the First Amendment’s religious protections, the Fourth Amendment’s protection against unreasonable searches and seizures, the Fifth and Sixth Amendments’ insistence upon fair criminal procedure, and the Eighth Amendment’s protection against cruel and unusual punishments, the private self-defense right does not significantly seek to protect individuals who might otherwise suffer unfair or inhumane treatment at the hands of a majority. Unlike the protections offered by many of these same Amendments, it does not involve matters as to which judges possess a comparative expertise, by virtue of their close familiarity with the justice system and its operation. And, unlike the Fifth Amendment’s insistence on just compensation, it does not involve a matter where a majority might unfairly seize for itself property belonging to a minority.
Finally, incorporation of the right will work a significant disruption in the constitutional allocation of decisionmaking authority, thereby interfering with the Constitution’s ability to further its objectives.
First, on any reasonable accounting, the incorporation of the right recognized in Heller would amount to a significant incursion on a traditional and important area of state concern, altering the constitutional relationship between the *922 States and the Federal Government. Private gun regulation is the quintessential exercise of a State’s “police power” — i. e., the power to “protec[t] . . . the lives, limbs, health, comfort, and quiet of all persons, and the protection of all property within the State,” by enacting “all kinds of restraints and burdens” on both “persons and property.” Slaughter-House Cases, 16 Wall. 36, 62 (1873) (internal quo: tation marks omitted). The Court has long recognized that the Constitution grants the States special authority to enact laws pursuant to this power. See, e. g., Medtronic, Inc. v. Lohr, 518 U. S. 470, 475 (1996) (noting that States have “great latitude” to use their police powers (internal quotation marks omitted)); Metropolitan Life Ins. Co. v. Massachusetts, 471 U. S. 724, 756 (1985). A decade ago, we wrote that there is “no better example of the police power” than “the suppression of violent crime.” United States v. Morrison, 529 U. S. 598, 618 (2000). And examples in which the Court has deferred to state legislative judgments in respect to the exercise of the police power are legion. See, e. g., Gonzales v. Oregon, 546 U. S. 243, 270 (2006) (assisted suicide); Washington v. Glucksberg, 521 U. S. 702, 721 (1997) (same); Berman v. Parker, 348 U. S. 26, 32 (1954) (“We deal, in other words, with what traditionally has been known as the police power. An attempt to define its reach or trace its outer limits is fruitless . . . ”).
Second, determining the constitutionality of a particular state gun law requires finding answers to complex empirically based questions of a kind that legislatures are better able than courts to make. See, e. g., Los Angeles v. Alameda Books, Inc., 535 U. S. 425, 440 (2002) (plurality opinion); Turner Broadcasting System, Inc. v. FCC, 520 U. S. 180, 195-196 (1997). And it may require this kind of analysis in virtually every case.
Government regulation of the right to bear arms normally embodies a judgment that the regulation will help save lives. The determination whether a gun regulation is constitutional would thus almost always require the weighing of the consti *923 tutional right to bear arms against the “primary concern of every government — a concern for the safety and indeed the lives of its citizens.” United States v. Salerno, 481 U. S. 739, 755 (1987). With respect to other incorporated rights, this sort of inquiry is sometimes present. See, e. g., Brandenburg v. Ohio, 395 U. S. 444, 447 (1969) (per curiam) (free speech); Sherbert v. Verner, 374 U. S. 398, 403 (1963) (religion); Brigham City v. Stuart, 547 U. S. 398, 403-404 (2006) (Fourth Amendment); New York v. Quarles, 467 U. S. 649, 655 (1984) (Fifth Amendment); Salerno, supra, at 755 (bail). But here, this inquiry — calling for the fine tuning of protective rules — is likely to be part of a daily judicial diet.
Given the competing interests, courts will have to try to answer empirical questions of a particularly difficult kind. Suppose, for example, that after a gun regulation’s adoption the murder rate went up. Without the gun regulation would the murder rate have risen even faster? How is this conclusion affected by the local recession which has left numerous people unemployed? What about budget cuts that led to a downsizing of the police force? How effective was that police force to begin with? And did the regulation simply take guns from those who use them for lawful purposes without affecting their possession by criminals?
Consider too that countless gun regulations of many shapes and sizes are in place in every State and in many local communities. Does the right to possess weapons for self-defense extend outside the home? To the car? To work? What sort of guns are necessary for self-defense? Handguns? Rifles? Semiautomatic weapons? When is a gun semiautomatic? Where are different kinds of weapons likely needed? Does time of day matter? Does the presence of a child in the house matter? Does the presence of a convicted felon in the house matter? Do police need special rules permitting patdowns designed to find guns? When do registration requirements become severe to the point that they amount to an unconstitutional ban? Who can possess guns and of what kind? Aliens? Prior drug offenders? *924 Prior alcohol abusers? How would the right interact with a state or local government’s ability to take special measures during, say, national security emergencies? As the questions suggest, state and local gun regulation can become highly complex, and these “are only a few uncertainties that quickly come to mind.” Caperton v. A. T. Massey Coal Co., 556 U. S. 868, 898 (2009) (Roberts, C. J., dissenting).
The difficulty of finding answers to these questions is exceeded only by the importance of doing so. Firearms cause well over 60,000 deaths and injuries in the United States each year. Those who live in urban areas, police officers, women, and children, all may be particularly at risk. And gun regulation may save their lives. Some experts have calculated, for example, that Chicago’s handgun ban has saved several hundred lives, perhaps close to 1,000, since it was enacted in 1983. Other experts argue that stringent gun regulations “can help protect police officers operating on the front lines against gun violence,” have reduced homicide rates in Washington, D. C., and Baltimore, and have helped to lower New York’s crime and homicide rates. Brief for Association of Prosecuting Attorneys et al. as Amici Curiae 13-16, 20.
At the same time, the opponents of regulation cast doubt on these studies. And who is right? Finding out may require interpreting studies that are only indirectly related to a particular regulatory statute, say, one banning handguns in the home. Suppose studies find more accidents and suicides where there is a handgun in the home than where there is a long gun in the home or no gun at all? To what extent do such studies justify a ban? What if opponents of the ban put forth counterstudies?
In answering such questions judges cannot simply refer to judicial homilies, such as Blackstone’s 18th-century perception that a man’s home is his castle. See 4 Blackstone 223. Nor can the plurality so simply reject, by mere assertion, the fact that “incorporation will require judges to assess the *925 costs and benefits of firearms restrictions.” Ante, at 790-791. How can the Court assess the strength of the government’s regulatory interests without addressing issues of empirical fact? How can the Court determine if a regulation is appropriately tailored without considering its impact? And how can the Court determine if there are less restrictive alternatives without considering what will happen if those alternatives are implemented?
Perhaps the Court could lessen the difficulty of the mission it has created for itself by adopting a jurisprudential approach similar to the many state courts that administer a state constitutional right to bear arms. See infra, at 930 (describing state approaches). But the Court has not yet done so. Cf. Heller, 554 U. S., at 634-635 (rejecting an “ 'interest-balancing’ approach” similar to that employed by the States); ante, at 790-791 (plurality opinion). Rather, the Court has haphazardly created a few simple rules, such as that it will not touch “prohibitions on the possession of firearms by felons and the mentally ill,” “laws forbidding the carrying of firearms in sensitive places such as schools and government buildings,” or “laws imposing conditions and qualifications on the commercial sale of arms.” Heller, swpra, at 626-627; ante, at 786 (plurality opinion). But why these rules and not others? Does the Court know that these regulations are justified by some special gun-related risk of death? In fact, the Court does not know. It has simply invented rules that sound sensible without being able to explain why or how Chicago’s handgun ban is different.
The fact is that judges do not know the answers to the kinds of empirically based questions that will often determine the need for particular forms of gun regulation. Nor do they have readily available “tools” for finding and evaluating the technical material submitted by others. District Attorney’s Office for Third Judicial Dist. v. Osborne, 557 U. S. 52, 74 (2009); see also Turner Broadcasting, 520 U. S., at 195— 196. Judges cannot easily make empirically based predic *926 tions; they have no way to gather and evaluate the data required to see if such predictions are accurate; and the nature of litigation and concerns about stare decisis farther make it difficult for judges to change course if predictions prove inaccurate. Nor can judges rely upon local community views and values when reaching judgments in circumstances where prediction is difficult because the basic facts are unclear or unknown.
At the same time, there is no institutional need to send judges off on this “mission-almost-impossible.” Legislators are able to “amass the stuff of actual experience and cull conclusions from it.” United States v. Gainey, 380 U. S. 63, 67 (1965). They are far better suited than judges to uncover facts and to understand their relevance. And legislators, unlike Article III judges, can be held democratically responsible for their empirically based and value-laden conclusions. We have thus repeatedly affirmed our preference for “legislative not judicial solutions” to this kind of problem, see, e. g., Patsy v. Board of Regents of Fla., 457 U. S. 496, 513 (1982), just as we have repeatedly affirmed the Constitution’s preference for democratic solutions legislated by those whom the people elect.
In New State Ice Co. v. Liebmann, 285 U. S. 262, 310-311 (1932), Justice Brandéis stated in dissent:
“Some people assert that our present plight is due, in part, to the limitations set by courts upon experimentation in the fields of social and economic science; and to the discouragement to which proposals for betterment there have been subjected otherwise. There must be power in the States and the Nation to remould, through experimentation, our economic practices and institutions to meet changing social and economic needs. I cannot believe that the framers of the Fourteenth Amendment, or the States which ratified it, intended to deprive us of the power to correct [the social problems we face].”
*927 There are 50 state legislatures. The fact that this Court may already have refused to take this wise advice with respect to Congress in Heller is no reason to make matters worse here.
Third, the ability of States to reflect local preferences and conditions — both key virtues of federalism — here has particular importance. The incidence of gun ownership varies substantially as between crowded cities and uncongested rural communities, as well as among the different geographic regions of the country. Thus, approximately 60% of adults who live in the relatively sparsely populated Western States of Alaska, Montana, and Wyoming report that their household keeps a gun, while fewer than 15% of adults in the densely populated Eastern States of Rhode Island, New Jersey, and Massachusetts say the same.
The nature of gun violence also varies as between rural communities and cities. Urban centers face significantly greater levels of firearm crime and homicide, while rural communities have proportionately greater problems with nonhomicide gun deaths, such as suicides and accidents. And idiosyncratic local factors can lead to two cities finding themselves in dramatically different circumstances: For example, in 2008, the murder rate was 40 times higher in New Orleans than it was in Lincoln, Nebraska.
It is thus unsurprising that States and local communities have historically differed about the need for gun regulation as well as about its proper level. Nor is it surprising that “primarily, and historically,” the law has treated the exercise of police powers, including gun control, as “matter[s] of local concern.” Medtronic, 518 U. S., at 475 (internal quotation marks omitted).
Fourth, although incorporation of any right removes decisions from the democratic process, the incorporation of this particular right does so without strong offsetting justification — as the example of Oak Park’s handgun ban helps to show. See Oak Park, Ill., Village Code §27-2-1 (2007). *928 Oak Park decided to ban handguns in 1983, after a local attorney was shot to death with a handgun that his assailant had smuggled into a courtroom in a blanket. Brief for Oak Park Citizens Committee for Handgun Control as Amicus Curiae 1, 21. A citizens committee spent months gathering information about handguns. Id., at 21. It secured 6,000 signatures from community residents in support of a ban. Id., at 21-22. And the village board enacted a ban into law. Id., at 22.
Subsequently, at the urging of ban opponents the board held a community referendum on the matter. Ibid. The citizens committee argued strongly in favor of the ban. Id., at 22-23. It pointed out that most guns owned in Oak Park were handguns and that handguns were misused more often than citizens used them in self-defense. Id., at 23. The ban opponents argued just as strongly to the contrary. Ibid. The public decided to keep the ban by a vote of 8,031 to 6,368. Ibid. And since that time, Oak Park now tells us, crime has decreased and the community has seen no accidental handgun deaths. Id., at 2.
Given the empirical and local value-laden nature of the questions that lie at the heart of the issue, why, in a Nation whose Constitution foresees democratic decisionmaking, is it so fundamental a matter as to require taking that power from the people? What is it here that the people did not know? What is it that a judge knows better?
* * *
In sum, the police power, the superiority of legislative decisionmaking, the need for local decisionmaking, the comparative desirability of democratic decisionmaking, the lack of a manageable judicial standard, and the life-threatening harm that may flow from striking down regulations all argue against incorporation. Where the incorporation of other rights has been at issue, some of these problems have arisen. But in this instance all these problems are present, all at *929 the same time, and all are likely to be present in most, perhaps nearly all, of the cases in which the constitutionality of a gun regulation is at issue. At the same time, the important factors that favor incorporation in other instances— e. g., the protection of broader constitutional objectives — are not present here. The upshot is that all factors militate against incorporation — with the possible exception of historical factors.
Ill
I must, then, return to history. The Court, in seeking to justify incorporation, asks whether the interests the Second Amendment protects are “‘deeply rooted in this Nation’s history and tradition.’” Ante, at 767 (quoting Glucksberg, 521 U. S., at 721). It looks to selected portions of the Nation’s history for the answer. And it finds an affirmative reply.
As I have made clear, I do not believe history is the only pertinent consideration. Nor would I read history as broadly as the majority does. In particular, since we here are evaluating a more particular right — namely, the right to bear arms for purposes of private self-defense — general historical references to the “right to keep and bear arms” are not always helpful. Depending upon context, early historical sources may mean to refer to a militia-based right — a matter of considerable importance 200 years ago — which has, as the majority points out, “largely faded as a popular concern.” Ante, at 770. There is no reason to believe that matters of such little contemporary importance should play a significant role in answering the incorporation question. See Apodaca, 406 U. S., at 410 (plurality opinion) (incorporation “inquiry must focus upon the function served” by the right in question in “contemporary society”); Wolf v. Colorado, 338 U. S. 25, 27 (1949) (incorporation must take into account “the movements of a free society” and “the gradual and empiric process of inclusion and exclusion” (internal quotation marks omitted)); cf. U. S. Const., Art. I, § 9 (prohibit *930 ing federal officeholders from accepting a “Title, of any kind whatever, from [a] foreign State” — presumably a matter of considerable importance 200 years ago).
That said, I can find much in the historical record that shows that some Americans in some places at certain times thought it important to keep and bear arms for private self-defense. For instance, the reader will see that many States have constitutional provisions protecting gun possession. But, as far as I can tell, those provisions typically do no more than guarantee that a gun regulation will be a reasonable police power regulation. See Winkler, Scrutinizing the Second Amendment, 105 Mich. L. Rev. 683, 686, 716-717 (2007) (hereinafter Winkler, Scrutinizing) (the “courts of every state to consider the question apply a deferential ‘reasonable regulation’ standard”); see also id., at 716-717 (explaining the difference between that standard and ordinary rational-basis review). It is thus altogether unclear whether such provisions would prohibit cities such as Chicago from enacting laws, such as the law before us, banning handguns. See id., at 723. The majority, however, would incorporate a right that is likely inconsistent with Chicago’s law; and the majority would almost certainly strike down that law. Cf. Heller, 554 U. S., at 628-635 (striking down the District of Columbia’s handgun ban).
Thus, the specific question before us is not whether there are references to the right to bear arms for self-defense throughout this Nation’s history — of course there are — or even whether the Court should incorporate a simple constitutional requirement that firearms regulations not unreasonably burden the right to keep and bear arms, but rather whether there is a consensus that so substantial a private self-defense right as the one described in Heller applies to the States. See, e. g., Glucksberg, supra, at 721 (requiring “a careful description” of the right at issue when deciding whether it is “deeply rooted in this Nation’s history and tradition” (internal quotation marks omitted)). On this ques *931 tion, the reader will have to make up his or her own mind about the historical record that I describe in part below. In my view, that record is insufficient to say that the right to bear arms for private self-defense, as explicated by Heller, is fundamental in the sense relevant to the incorporation inquiry. As the evidence below shows, States and localities have consistently enacted fireárms regulations, including regulations similar to those at issue here, throughout our Nation’s history. Courts have repeatedly upheld such regulations. And it is, at the very least, possible, and perhaps likely, that incorporation will impose on every, or nearly every, State a different right to bear arms than they currently recognize — a right that threatens to destabilize settled state, legal principles. Cf. 554 U. S., at 634-635 (rejecting an “'interest-balancing’ approach” similar to that employed by the States).
I thus cannot find a historical consensus with respect to whether the right described by Heller is “fundamental” as our incorporation cases use that term. Nor can I find sufficient historical support for the majority’s conclusion that that right is “deeply rooted in this Nation’s history and tradition.” Instead, I find no more than ambiguity and uncertainty that perhaps even expert historians would find difficult to penetrate. And a historical record that is so ambiguous cannot itself provide an adequate basis for incorporating a private right of self-defense and applying it against the States.

The 18th Century

The opinions in Heller collect much of the relevant 18th-century evidence. See 554 U. S., at 579-605; id., at 640-665 (Stevens, J., dissenting); id., at 683-687 (Breyer, J., dissenting). In respect to the relevant question — the “deeply rooted nature” of a right to keep and bear arms for purposes of private self-defense — that evidence is inconclusive, particularly when augmented as follows:
*932 First, as I have noted earlier in this opinion, and Justice Stevens argued in dissent, the history discussed in Heller shows that the Second Amendment was enacted primarily for the purpose of protecting militia-related rights. See supra, at 915-916; Heller, supra, at 579-605. Many of the scholars and historians who have written on the subject apparently agree. See supra, at 914-916.
Second, historians now tell us that the right to which Blaekstone referred, an important link in the Heller majority’s historical argument, concerned the right of Parliament (representing the people) to form a militia to oppose a tyrant (the King) threatening to deprive the people of their traditional liberties (which did not include an unregulated right to possess guns). Thus, 18th-century language referring to a “right to keep and bear arms” does not ipso facto refer to a private right of self-defense — certainly not unambiguously so. See English Historians’ Brief 3-27; see also supra, at 914-916.
Third, scholarly articles indicate that firearms were heavily regulated at the time of the framing — perhaps more heavily regulated than the Court in Heller believed. For example, one scholar writes that “[hjundreds of individual statutes regulated the possession and use of guns in colonial and early national America.” Churchill, Gun Regulation, the Police Power, and the Right To Keep Arms, 25 Law & Hist. Rev. 139,143 (2007). Among these statutes was a ban on the private firing of weapons in Boston, as well as comprehensive restrictions on similar conduct in Philadelphia and New York. See Acts and Laws of Massachusetts Bay, p. 208 (1746); 5 J. Mitchell & H. Flanders, Statutes at Large of Pennsylvania From 1682 to 1801, pp. 108-109 (1898); 4 Colonial Laws of New York ch. 1233, p. 748 (1894); see also Churchill, supra, at 162-163 (discussing bans on the shooting of guns in Pennsylvania and New York).
Fourth, after the Constitution was adopted, several States continued to regulate firearms possession by, for example, *933 adopting rules that would have prevented the carrying of loaded firearms in the city, Heller, 554 U. S., at 684-686 (Breyer, J., dissenting); see also id., at 631-633. Scholars have thus concluded that the primary Revolutionary-era limitation on a State’s police power to regulate guns appears to be only that regulations were-“aimed at a legitimate public purpose” and “consistent with reason.” Cornell, Early American Gun Regulation and the Second Amendment, 25 Law & Hist. Rev. 197, 198 (2007).

The Pre-Civil War 19th Century

I would also augment the majority’s account of this period as follows:
First, additional States began to regulate the discharge of firearms in public places. See, e. g., Act of Peb. 17, 1831, §6, reprinted in 3 Statutes of Ohio and the Northwestern Territory 1740 (S. Chase ed. 1835); Act of Dec. 3, 1825,1825 Tenn. Priv. Acts ch. 292, pp. 306-307.
Second, States began to regulate the possession of concealed weapons, which were both popular and dangerous. See, e. g., C. Cramer, Concealed Weapon Laws of the Early Republic 143-152 (1999) (collecting examples); see also 1837-1838 Tenn. Acts ch. 137, pp. 200-201 (banning the wearing, sale, or giving of Bowie knives); 1847 Va. Acts ch. 7, §8, p. 110 (“Any free person who shall habitually carry about his person, hidden from common observation, any pistol, dirk, bowie knife, or weapon of the like kind, from the use of which the death of any person might probably ensue, shall for every offence be punished by [a] fine not exceeding fifty dollars”).
State courts repeatedly upheld the validity of such laws, finding that, even when the state constitution granted a right to bear arms, the legislature was permitted to, e. g., “abolish” these small, inexpensive, “most dangerous weapons entirely from use,” even in self-defense. Day v. State, 37 Tenn. 496, 500 (1858); see also, e. g., State v. Jumel, 13 La. Ann. 399, 400 (1858) (upholding concealed weapon ban because it “prohib *934 it[ed] only a particular mode of bearing arms which is found dangerous to the peace of society”); State v. Chandler, 5 La. Ann. 489, 489-490 (1850) (upholding concealed weapon ban and describing the law .as “absolutely necessary to counteract a vicious state of society, growing out of the habit of carrying concealed weapons”); State v. Reid, 1 Ala. 612, 616-617 (1840).

The Post-Civil War 19th Century

It is important to read the majority’s account with the following considerations in mind:
First, the plurality today properly declines to revisit our interpretation of the Privileges or Immunities Clause. See ante, at 758. The Court’s case for incorporation must thus rest on the conclusion that the right to bear arms is “fundamental.” But the very evidence that it advances in support of the conclusion that Reconstruction-era Americans strongly supported a private self-defense right shows with equal force that Americans wanted African-American citizens to have the same rights to possess guns as did white citizens. Ante, at 770-778. Here, for example, is what Congress said when it enacted a Fourteenth Amendment predecessor, the Second Freedmen’s Bureau Act. It wrote that the statute, in order to secure “the constitutional right to bear arms ... for all citizens,” would ensure that each citizen:
“shall have . . . full and equal benefit of all laws and proceedings concerning personal liberty, personal security, and the acquisition, enjoyment, and disposition of estate, real and personal, including the constitutional Tight to bear arms, [by securing] ... to ... all the citizens of [every] . . . State or district without respect to race or color, or previous condition of slavery.” §14, 14 Stat. 176-177 (emphasis added).
This sounds like an antidiscrimination provision. See Rosenthal, The New Originalism Meets the Fourteenth Amend *935 ment: Original Public Meaning and the Problem of Incorporation, 18 J. Contemp. Legal Issues 361, 383-384 (2009) (discussing evidence that the Freedmen’s Bureau was focused on discrimination).
Another Fourteenth Amendment predecessor, the Civil Rights Act of 1866, also took aim at discrimination. See § 1, 14 Stat. 27 (citizens of “every race and color, without regard to any previous condition of slavery or involuntary servitude ... shall have the same right [to engage in various activities] and to full and equal benefit of all laws ... as is enjoyed by white citizens”). And, of course, the Fourteenth Amendment itself insists that all States guarantee their citizens the “equal protection of the laws.”
There is thus every reason to believe that the fundamental concern of the Reconstruction Congress was the eradication of discrimination, not the provision of a new substantive right to bear arms free from reasonable state police power regulation. See, e. g., Brief for Municipal Respondents 62-69 (discussing congressional record evidence that Reconstruction Congress was concerned about discrimination). Indeed, why would those who wrote the Fourteenth Amendment have wanted to give such a right to Southerners who had so recently waged war against the North, and who continued to disarm and oppress recently freed African-American citizens? Cf. Act of Mar. 2, 1867, § 6, 14 Stat. 487 (disbanding Southern militias because they were, inter alia, disarming the freedmen).
Second, firearms regulation in the later part of the 19th century was common. The majority is correct that the Freedmen’s Bureau points to a right to bear arms, and it stands to reason, as the majority points out, that “[i]t would have been nonsensical for Congress to guarantee the . . . equal benefit of a... right that does not exist.” Ante, at 779. But the majority points to no evidence that there existed during this period a fundamental right to bear arms for private self-defense immune to the reasonable exercise of the *936 state police power. See Emberton, The Limits of Incorporation: Violence, Gun Rights, and Gun Regulation in the Reconstruction South, 17 Stan. L. & Pol’y Rev. 615, 621-622 (2006) (noting that history shows that “nineteenth-century Americans” were “not opposed to the idea that the state should be able to control the use of firearms”).
To the contrary, in the latter half of the 19th century, a number of state constitutions adopted or amended after the Civil War explicitly recognized the legislature’s general ability to limit the right to bear arms. See Tex. Const., Art. I, § 13 (1869) (protecting “the right to keep and bear arms,” “under such regulations as the legislature may prescribe”); Idaho Const., Art. I, § 11 (1889) (“The people shall have the right to bear arms . . . ; but the Legislature shall regulate the exercise of this right by law”); Utah Const., Art. I, § 6 (1896) (same). And numerous other state constitutional provisions adopted during this period explicitly granted the legislature various types of regulatory power over firearms. See Brief for Thirty-Pour Professional Historians and Legal Historians as Amici Curiae 14-15 (hereinafter Legal Historians’ Brief).
Moreover, four States largely banned the possession of all nonmilitary handguns during this period. See 1879 Term. Acts ch. 186, § 1 (prohibiting citizens from carrying “publicly or privately, any . . . belt or pocket pistol, revolver, or any kind of pistol, except the army or navy pistol, usually used in warfare, which shall be carried openly in the hand”); 1876 Wyo. Comp. Laws ch. 52, § 1 (forbidding “concealed or ope[n]” bearing of “any fire arm or other deadly weapon, within the limits of any city, town or village”); 1881 Ark. Acts no. 96, § 1 (prohibiting the “wearing] or carrying] ” of “any pistol. . . except such pistols as are used in the army or navy,” except while traveling or at home); 1871 Tex. Gen. Laws ch. 34 (prohibiting the carrying of pistols unless there are “immediate and pressing” reasonable grounds to fear “immediate and pressing” attack or for militia service). Fifteen States *937 banned the concealed carrying of pistols and other deadly weapons. See Legal Historians’ Brief 16, n. 14. And individual municipalities enacted stringent gun controls, often in response to local conditions — Dodge City, Kansas, for example, joined many western cattle towns in banning the carrying of pistols and other dangerous weapons in response to violence accompanying western cattle drives. See Brief for Municipal Respondents 30 (citing Dodge City, Kan., Ordinance No. 16, § XI (Sept. 22, 1876)); Courtwright, The Cowboy Subculture, in Guns in America: A Reader 86, 96 (J. Dizard, R. Muth, & S. Andrews eds. 1999) (discussing how Western cattle towns required cowboys to “‘check’” their guns upon entering town).
Further, much as they had during the period before the Civil War, state courts routinely upheld such restrictions. See, e. g., English v. State, 35 Tex. 473 (1871); Hill v. State, 53 Ga. 472, 475 (1874); Fife v. State, 31 Ark. 455, 461 (1876); State v. Workman, 35 W. Va. 367, 373, 14 S. E. 9, 11 (1891). The Tennessee Supreme Court, in upholding a ban on possession of nonmilitary handguns and certain other weapons, summarized the Reconstruction understanding of the States’ police power to regulate firearms:
“Admitting the right of self-defense in its broadest sense, still on sound principle every good citizen is bound to yield his preference as to the means to be used, to the demands of the public good; and where certain weapons are forbidden to be kept or used by the law of the land, in order to the prevention of [sic] crime — a great public end — no man can be permitted to disregard this general end, and demand of the community the right, in order to gratify his whim or willful desire to use a particular weapon in his particular self-defense. The law allows ample means of self-defense, without the use of the weapons which we have held may be rightfully proscribed by this statute. The object being to banish these weapons from the community by an absolute pro *938 hibition for the prevention of crime, no man’s particular safety, if such case could exist, ought to be allowed to defeat this end.” Andrews v. State, 50 Tenn. 165, 188-189 (1871) (emphasis added).

The 20th and 21st Centuries

Although the majority does not discuss 20th- or 21st-century evidence concerning the Second Amendment at any length, I think that it is essential to consider the recent history of the right to bear arms for private self-defense when considering whether the right is “fundamental.” To that end, many States now provide state constitutional protection for an individual’s right to keep and bear arms. See Volokh, State Constitutional Rights To Keep and Bear Arms, 11 Tex. Rev. L. & Politics 191,205 (2006) (identifying over 40 States). In determining the importance of this fact, we should keep the following considerations in mind:
First, by the end of the 20th century, in every State and many local communities, highly detailed and complicated regulatory schemes governed (and continue to govern) nearly every aspect of firearm ownership: Who may sell guns and how they must be sold; who may purchase guns and what type of guns may be purchased; how firearms must be stored and where they may be used; and so on. See generally Legal Community Against Violence, Regulating Guns in America (2008), online at http://www.lcav.org/ publications-briefs/regulating_guns.asp (all Internet materials as visited June 24, 2010, and available in Clerk of Court’s case file) (detailing various arms regulations in every State).
Of particular relevance here, some municipalities ban handguns, even in States that constitutionally protect the right to bear arms. See Chicago, Ill., Municipal Code § 8-20-050(c) (2009); Oak Park, Ill., Village Code §§27-2-1 (2007), 27-1-1 (2009); Toledo, Ohio, Municipal Code, ch. 549.25 (2010). Moreover, at least seven States and Puerto Rico ban *939 assault weapons or semiautomatic weapons. See Cal. Penal Code Ann. § 12280(b) (2009 West Supp.); Conn. Gen. Stat. § 53-202c (2007); Haw. Rev. Stat. § 134-8 (1993); Md. Crim. Law Code Ann. §4-303(a) (Lexis 2002); Mass. Gen. Laws, ch. 140, §131M (West 2006); N. J. Stat. Ann. §2C:39-5 (West Supp. 2010); N. Y. Penal Law Ann. §265.02(7) (West Supp. 2008); 25 Laws P. R. Ann. §456m (Supp. 2006); see also 18 U. S. C. § 922(o) (federal maehinegun ban).
Thirteen municipalities do the same. See Albany, N. Y, City Code §193-16(A) (2005); Aurora, Ill., Code of Ordinances § 29-49(a) (2010); Buffalo, N. Y, City Code § 180-1(F) (2000); Chicago, Ill., Municipal Code §8-24-025(a) (2009); Cincinnati, Ohio, Municipal Code §708-37(a) (2008); Cleveland, Ohio, Codified Ordinances § 628.03(a) (2008); Columbus, Ohio, City Code §2323.31 (2005); Denver, Colo., Municipal Code § 38-130(e) (2008); Morton Grove, Ill., Village Code § 6-2-3(A) (2009); N. Y. C. Admin. Code §10-303.1.(2009); Oak Park, Ill., Village Code §27-2-1 (2007); Rochester, N. Y. City Code § 47-5(F) (2008); Toledo, Ohio, Municipal Code § 549.23(a). And two States, Maryland and Hawaii, ban assault pistols. See Haw. Rev. Stat. § 134-8; Md. Crim. Law Code Ann. §4-303.
Second, as I stated earlier, state courts in States with constitutions that provide gun rights have almost uniformly interpreted those rights as providing protection only against unreasonable regulation of guns. See, e. g., Winkler, Scrutinizing 686 (the “courts of every state to consider” a gun regulation apply the “ ‘reasonable regulation’ ” approach); State v. McAdams, 714 P. 2d 1236, 1238 (Wyo. 1986); Robertson v. City and County of Denver, 874 P. 2d 325, 328 (Colo. 1994).
When determining reasonableness those courts have normally adopted a highly deferential attitude toward legislative determinations. See Winkler, Scrutinizing 723 (identifying only six cases in the 60 years before the article’s publication striking down gun-control laws: three that banned “the transportation of any firearms for any purpose *940 whatsoever,” a single “permitting law,” and two as-applied challenges in “unusual circumstances”). Hence, as evidenced by the breadth of existing regulations, States and local governments maintain substantial flexibility to regulate firearms — much as they seemingly have throughout the Nation’s history — even in those States with an arms right in their constitutions.
Although one scholar implies that state courts are less willing to permit total gun prohibitions, see Volokh, Implementing the Right To Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda, 56 UCLA L. Rev. 1443, 1458 (2009), I am aware of no instances in the past 50 years in which a state court has struck down as unconstitutional a law banning a particular class of firearms, see Winkler, Scrutinizing 723.
Indeed, state courts have specifically upheld as constitutional (under their state constitutions) firearms regulations that have included handgun bans. See Kalodimos v. Morton Grove, 103 Ill. 2d 483, 499-500, 470 N. E. 2d 266, 273 (1984) (upholding a handgun ban because the arms right is merely a right “to possess some form of weapon suitable for self-defense or recreation”); Cleveland v. Turner, 1977 WL 201393, *5 (Ohio App., Aug. 4, 1977) (handgun ban “does not absolutely interfere with the right of the people to bear arms, but rather proscribes possession of a specifically defined category of handguns”); State v. Bolin 378 S. C. 96, 99, 662 S. E. 2d 38, 39- (2008) (ban on handgun possession by persons under 21 did not infringe arms right because they can “posses[s] other types of guns”). Thus, the majority’s decision to incorporate the private self-defense right recognized in Heller threatens to alter state regulatory regimes, at least as they pertain to handguns.
Third, the plurality correctly points out that only a few state courts, a “paucity” of state courts, have specifically upheld handgun bans. Ante, at 786. But which state courts have struck them down? The absence of supporting infor *941 mation does not help the majority find support. Cf. United States v. Wells, 519 U. S. 482, 496 (1997) (noting that it is “treacherous to find in congressional silence alone the adoption of a controlling rule of law” (internal quotation marks omitted)). Silence does not show or tend to show a consensus that a private self-defense right (strong enough to strike down a handgun ban) is “deeply rooted in this Nation’s history and tradition.”
* * *
In sum, the Framers did not write the Second Amendment in order to protect a private right of armed self-defense. There has been, and is, no consensus that the right is, or was, “fundamental.” No broader constitutional interest or principle supports legal treatment of that right as fundamental. To the contrary, broader constitutional concerns of an institutional nature argue strongly against that treatment.
Moreover, nothing in 18th-, 19th-, 20th-, or 21st-century history shows a consensus that the right to private armed self-defense, as described in Heller, is “deeply rooted in this Nation’s history [or] tradition” or is otherwise “fundamental.” Indeed, incorporating the right recognized in Heller may change the law in many of the 50 States. Read in the majority’s favor, the historical evidence is at most ambiguous. And, in the absence of any other support for its conclusion, ambiguous history cannot show that the Fourteenth Amendment incorporates a private right of self-defense against the States.
With respect, I dissent.
APPENDIX
Sources Supporting Data in Part II-B

Popular Consensus

Please see the following sources to support the paragraph on popular opinion, supra, at 920:
*942 • Briefs filed in this case that argue against incorporation include: Brief for United States Conference of Mayors as Amicus Curiae 1, 17-33 (organization representing “all United States cities with populations of 30,000 or more”); Brief for American Cities et al. as Amici Curiae 1-3 (brief filed on behalf of many cities, e. g., Philadelphia, Seattle, San Francisco, Oakland, Cleveland); Brief for Representative Carolyn McCarthy et al. as Amici Curiae 5-10; Brief for State of Illinois et al. as Amici Curiae 7-35.
• Wilkinson, Of Guns, Abortions, and the Unraveling Rule of Law, 95 Ya. L. Rev. 253, 301 (2009) (discussing divided public opinion over the correct level of gun control).

Data on Gun Violence

Please see the following sources to support the sentences concerning gun violence, supra, at 924:
• Dept. of Justice, Bureau of Justice Statistics, M. Zawitz & K. Strom, Firearm Injury and Death From Crime, 1993-97, p. 2 (Oct. 2000) (over 60,000 deaths and injuries caused by firearms each year).
• Campbell et al., Risk Factors for Femicide in Abusive Relationships: Results From a Multisite Case Control Study, 93 Am. J. Pub. Health 1089, 1092 (2003) (noting that an abusive partner’s access to a firearm increases the risk of homicide eightfold for women in physically abusive relationship).
• American Academy of Pediatrics, Firearm-Related Injuries Affecting the Pediatric Population, 105 Pediatrics 888 (2000) (noting that in 1997 “firearm-related deaths accounted for 22.5% of all injury deaths” for individuals between 1 and 19).
• Dept. of Justice, Federal Bureau of Investigation, Law Enforcement Officers Killed & Assaulted, 2006 (Table 27) (noting that firearms killed 93% of the 562 law en *943 forcement officers feloniously killed in the line of duty between 1997 and 2006), online at http://www2.fbi.gov/ ucr/killed/2006/table27.html.
• Dept. of Justice, Bureau of Justice Statistics, D. Duhart, Urban, Suburban, and Rural Victimization, 1993-98, pp. 1, 9 (Oct. 2000) (those who live in urban areas particularly at risk of firearm violence).
• Wintemute, The Future of Firearm Violence Prevention, 281 JAMA 475 (1999) (“half of all homicides occurred in 63 cities with 16% of the nation’s population”).

Data on the Effectiveness of Regulation

Please see the following sources to support the sentences concerning the effectiveness of regulation, supra, at 924:
• See Brief for Professors of Criminal Justice as Amici Curiae 13 (noting that Chicago’s handgun ban saved several hundred lives, perhaps close to 1,000, since it was enacted in 1983).
• Brief for Association of Prosecuting Attorneys et al. as Amici Curiae 13-16, 20 (arguing that stringent gun regulations “can help protect police officers operating on the front lines against gun violence,” and have reduced homicide rates in Washington, D. C., and Baltimore).
• Brief for United States Conference of Mayors as Amicus Curiae 4-13 (arguing that gun regulations have helped to lower New York’s crime and homicide rates).

Data on Handguns in the Home

Please see the following sources referenced in the sentences discussing studies concerning handguns in the home, supra, at 924:
• Brief for American Public Health Association et al. as Amici Curiae 13-16 (discussing studies that show handgun ownership in the home is associated with increased risk of homicide).
*944 • Wiebe, Firearms in US Homes as a Risk Factor for Unintentional Gunshot Fatality, 35 Accident Analysis and Prevention 711, 713-714 (2003) (showing that those who die in firearms accidents are nearly four times more likely than average to have a gun in their home).
• Kellermann et al., Suicide in the Home in Relation to Gun Ownership, 327 New England J. Medicine 467, 470 (1992) (demonstrating that “homes with one or more handguns were associated with a risk of suicide almost twice as high as that in homes containing only long guns”).

Data on Regional Views and Conditions

Please see the following sources referenced in the section on the diversity of regional views and conditions, supra, at 927:
• Okoro et al., Prevalence of Household Firearms and Firearm-Storage Practices in the 50 States and the District of Columbia: Findings From the Behavioral Risk Factor Surveillance System, 2002, 116 Pediatrics e370, e372 (2005) (presenting data on firearm ownership by State).
• Heller, 554 U. S., at 698-699 (Breyer, J., dissenting) (discussing various sources showing that gun violence varies by State, including Wintemute, supra.
• Heller, supra, at 698-699 (Breyer, J., dissenting) (discussing the fact that urban centers face significantly greater levels of firearm crime and homicide, while rural communities have proportionately greater problems with nonhomicide gun deaths, such as suicides and accidents (citing Branas, Nance, Elliott, Richmond, & Schwab, Urban-Rural Shifts in Intentional Firearm Death, 94 Am. J. Public Health 1750,1752 (2004))).
• Dept. of Justice, Federal Bureau of Investigation, 2008 Crime in the United States (Table 6) (noting that murder rate is 40 times higher in New Orleans than it is in Lincoln, Nebraska).